RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0351p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MICHAEL HESTER,

*Plaintiff-Appellant*,

*v.*

No. 24-5800

CHESTER COUNTY, TENNESSEE; BLAIR WEAVER; MARK
GRIFFIN; BRIAN STOUT,

*Defendants-Appellees*.

───────────────

Appeal from the United States District Court for the Western District of Tennessee at Jackson.
No. 1:24-cv-01034—S. Thomas Anderson, District Judge.

Argued:  May 7, 2025

Decided and Filed:  December 19, 2025

Before: CLAY, READLER, and DAVIS, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:**  Charles H. Barnett, IV, SPRAGINS, BARNETT & COBB, PLC, Jackson,
Tennessee, for Appellant.  Nathan D. Tilly, PENTECOST, GLENN & TILLY, PLLC, Jackson,
Tennessee, for Appellees.  **ON BRIEF:**  Charles H. Barnett, IV, Sara E. Barnett, SPRAGINS,
BARNETT & COBB, PLC, Jackson, Tennessee, for Appellant.  Nathan D. Tilly, PENTECOST,
GLENN & TILLY, PLLC, Jackson, Tennessee, for Appellees.

───────────────

## OPINION

───────────────

DAVIS, Circuit Judge.  Michael Hester was granted parole after serving less than the
aggregate term of his sentences on multiple convictions.  He remained in prison, however, for
four months beyond his parole release date because of a detainer lodged by Chester County,

Tennessee, law enforcement officials.  Based on this delayed release, he sued Chester County; county officials including the sheriff, a deputy sheriff, and the jail administrator; several state officials; and ten John Doe defendants, under 42 U.S.C. § 1983.  Hester alleged that the Chester County defendants knowingly or recklessly used an invalid detainer warrant to prevent his release on parole, and in doing so violated his right to due process under the Fourth and Fourteenth Amendments and violated the Tennessee constitution and state law.  The district court granted the county defendants' motion to dismiss for failure to state a claim.  Hester timely appealed.  We AFFIRM.

## I.

### A.  Factual Background

According to the complaint, Hester pleaded guilty to criminal charges in Madison County, Tennessee, in 2016 and received a ten-year prison sentence.  He was later released on probation.  But in 2019, he was arrested on new charges in Chester County, Tennessee, which resulted in the revocation of his Madison County probation.  The Chester County arrest led to Hester's indictment on three misdemeanor charges for driving while his license was revoked and two felony charges for possession with intent to sell and possession with intent to deliver schedule II drugs.  He pleaded guilty to all five charges and received a sentence of 11 months and 29 days for the three merged misdemeanor counts and 6 years for the two felony drug counts.  The Chester County Circuit Court ordered the sentences on all five counts to run concurrently but consecutively to the Madison County probation-revocation sentence.  This resulted in a combined total sentence of sixteen years with a sentence expiration date of January 27, 2033.  Hester was remanded to the custody of the Tennessee Department of Corrections ("TDOC") to serve his time at the Morgan County Correctional Complex ("MCCX").  Hester became eligible for parole in due course.

Following a parole hearing on January 10, 2023, the Tennessee Board of Parole granted Hester parole and issued him a Certificate of Parole (alternately "Certificate" or "COP").  The Certificate "ordered that [Hester] be, and hereby is paroled . . . effective [February 15, 2023]." (COP, R. 1-3, PageID 27).

Shortly before Hester's parole release date, Chester County Jail Administrator Brian Stout called Hester and informed him that Stout and Deputy Sheriff Mark Griffin "took it upon themselves" to lodge a detainer warrant that would prevent Hester's release from MCCX. (Compl., R. 1, PageID 5). On February 14, 2023, Stout filed the detainer warrant. As a result, Hester's parole release date came and went with no release. Hester alleges that Stout, Griffin, and Sheriff Blair Weaver "falsely asserted" that Hester had not completed his sentence and that he was required to serve another 11 months and 29 days at Chester County Jail. (*Id.* at PageID 9).

Hester and his family fruitlessly worked to bring about his release. And at one point, Stout said that he was "working on it." (*Id.* at PageID 6). But, according to Hester, none of the county defendants intervened to clarify or resolve the matter. They allegedly "refused to consider Mr. Hester's complaints." (*Id.* at PageID 9). Hester ultimately retained counsel to assist with obtaining his release. Once Hester's counsel intervened, the detainer was lifted on May 10, 2023—84 days after Hester's effective parole release date. Further unknown delays resulted in another 43 days after that. Hester was ultimately released on parole on June 22, 2023—127 days after his effective release date of February 15, 2023.

## B. Procedural Background

In February 2024, Hester sued Chester County and county officials: Weaver, Griffin, and Stout; state officials: Mike Parris, Jim Purviance, and Frank Strada; and ten John Doe defendants who were allegedly involved in his "over detention," under 42 U.S.C. § 1983. (*Id.* at PageID 3–4). His complaint alleges that Defendants violated his rights under the Fourth and Fourteenth Amendments by incarcerating him without legal authority. It also asserts that Defendants violated the Tennessee constitution and state tort laws. Chester County, Weaver, Griffin, and Stout ("county defendants") moved to dismiss the case for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Weaver, Griffin, and Stout claimed they were entitled to qualified immunity. Parris, Purviance, and Strada ("state defendants") filed a separate motion to dismiss for failure to state a claim. Hester voluntarily dismissed his claims against the state defendants. And the district court later granted the county defendants' motion to dismiss. The district court decided that because Hester did not have a liberty interest in release on parole,

Weaver, Griffin, and Stout were entitled to qualified immunity, and it concluded that Hester did not plausibly plead a *Monell* claim against Chester County.  After dismissing all of Hester's federal claims, the district court declined to exercise supplemental jurisdiction over his state-law claims.  Hester timely appealed.

## II.

We review de novo a district court's order granting a motion to dismiss for failure to state a claim under Rule 12(b)(6).  *Smith v. Kentucky*, 36 F.4th 671, 674 (6th Cir. 2022).  We also review de novo a district court's grant of qualified immunity.  *See Libertarian Nat'l Comm., Inc. v. Holiday*, 907 F.3d 941, 945 (6th Cir. 2018).  We "must construe the allegations of the complaint in the light most favorable to plaintiffs [and] accept all well-pled factual allegations as true." *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 597 (6th Cir. 2013).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified).  "This plausibility standard requires the plaintiff to plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Lindke v. Tomlinson*, 31 F.4th 487, 496 (6th Cir. 2022) (citation modified).  Our review is generally limited to the four corners of the complaint, *see* Fed. R. Civ. P. 12(d), but we may consider documents attached to the complaint or incorporated by reference that are central to the claim, *see Berry v. U.S. Dep't of Lab.*, 832 F.3d 627, 637 (6th Cir. 2016).  Here, Hester attached to his complaint the sentencing orders from the county court and his COP, which we consider below.

## III.

Hester claims that the county defendants violated his Fourteenth Amendment right to due process when they knowingly or recklessly issued an invalid detainer warrant that prevented his release on his parole effective date.[1]  "To state a claim under § 1983, a plaintiff must allege the

---

[1]Hester also briefly attempts to reprise his claim under the Fourth Amendment, without developing any argument to support its application to his circumstances.  Instead, he merely points out that Fourth Amendment protections apply "beyond initial seizure" and thereby encompass instances of "continued detention without probable cause."  (Appellant Br., ECF 9, 48).  But Hester fails to illuminate how these concepts help him.  Indeed,

violation of a right secured by the Constitution and laws of the United States[] and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted).  The Fourteenth Amendment's Due Process Clause prohibits state actors from depriving "any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  To establish a violation of the due process clause, Hester must show that (1) he had a protected interest, (2) he was deprived of that interest, and (3) the state did not afford him adequate process before the deprivation.  *See EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012).

### 1.  Qualified Immunity

Weaver, Griffin, and Stout assert qualified immunity.  Qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To overcome a claim of qualified immunity, the plaintiff must show that "(1) [Defendants] violated a federal statutory or constitutional right, and (2) the unlawfulness of [Defendants'] conduct was clearly established at the time." *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)).  We may consider these requirements in the order of our choosing.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  "If one is lacking, we need not address the other." *Crawford*, 15 F.4th at 760.

A right is clearly established when every reasonable official would understand that his conduct violates that right.  *Id.* at 763.  "Though a plaintiff need not point to a case on all fours with the instant fact pattern to form the basis of a clearly established right, there must be a sufficiently analogous case (or cases) from which a reasonable official would understand that what he is doing violates that right." *Pleasant View Baptist Church v. Beshear*, 78 F.4th 286, 295 (6th Cir. 2023) (citation modified).

---

the cases he cites discuss pretrial detentions without probable cause and malicious prosecution—claims that he does not assert on appeal. (*Id.* (citing *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010); *Gregory v. City of Louisville*, 444 F.3d 725, 747–51 (6th Cir. 2006))).  As he has not otherwise developed any Fourth Amendment claim, any such argument is forfeited.  *See Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022).

Here, Hester has not provided legal authority supporting his allegation that he possessed a plausible liberty interest in release on parole. So we need not consider whether he was deprived of any such interest or the adequacy of any process he may have received. And even if he had made out a plausible violation, Hester has failed to point to any binding caselaw clearly establishing the existence of the right he claims. Therefore, the individual county defendants are entitled to qualified immunity.

### a. Liberty Interest in Parole Release

Hester frames his claim as one seeking redress for a violation of a liberty interest in release following a grant of parole rather than a liberty interest in obtaining a grant of parole.[2] In so doing, he apparently seeks to shed the constraints of our prior holdings that there is no liberty interest in parole under Tennessee law. *See Wright v. Trammell*, 810 F.2d 589, 591 (6th Cir. 1987) (per curiam); *Seagroves v. Tenn. Bd. of Prob. & Parole*, 86 F. App'x 45, 48 (6th Cir. 2003) (citing TENN. CODE ANN. §§ 40-28-117(a) and 40-35-503(b) (1999)). Indeed, we recently reiterated in *Thomas v. Montgomery* that "inmates in Tennessee do not have a constitutionally recognized expectation of receiving parole because the statutory scheme does not sufficiently constrain the Board's discretion to deny parole." 140 F.4th 335, 342 (6th Cir. 2025). And, as discussed in Subsection *b.* below, his effort to cast his claim as one analogous to over-detention is unavailing.

The Supreme Court has stated unequivocally, "[t]here is no constitutional or inherent right of a convicted person to be conditionally released [on parole] before the expiration of a valid sentence." *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). A "mere unilateral hope or expectation of release on parole" does not create a protected liberty interest; the person "must, instead, have a legitimate claim of *entitlement* to it." *Inmates of Orient Corr. Inst. v. Ohio State Adult Parole Auth.*, 929 F.2d 233, 235 (6th Cir. 1991) (quoting *Greenholtz*, 442 U.S. at 7). Rather, "[a] liberty interest may arise from the Constitution itself, by

---

[2]Hester emphasizes his allegations supporting his assertions that the county defendants issued the detainer knowingly or recklessly. However, while we credit Hester's well-pleaded factual allegations concerning the county defendants' conduct and all reasonable inferences therefrom to Hester, ultimately the validity of a detainer does not drive our determination about whether the liberty interest requirement of a procedural due process claim is satisfied. *See EJS Props.*, 698 F.3d at 855.

reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (internal citations omitted). *Greenholtz* provides an apt example of how this can occur. There, a Nebraska statute provided that the parole board "shall" release parole-eligible inmates unless certain exclusionary factors applied. *Greenholtz*, 442 U.S. at 11. The mandatory nature of the scheme led the Supreme Court to conclude that the statute created a liberty interest in parole. *Id.* at 11–13; *see also Bd. of Pardons v. Allen*, 482 U.S. 369, 372 (1987) (same under Montana parole statute); *Swarthout v. Cooke*, 562 U.S. 216, 219–20 (2011) (per curiam) (same under California law). Such an interest arose because the language of the statute produced an "expectancy of release" that was "entitled to some measure of constitutional protection." *Greenholtz*, 442 U.S. at 12. In fact, the structure of the Nebraska law created a default position that inmates would be released *unless* certain conditions existed. *Id.* at 11–12. Because of this design, the Supreme Court observed that Nebraska's "statute ha[d] unique structure and language and thus whether any other state statute provides a protectible entitlement must be decided on a case-by-case basis." *Id.* at 12. Nonetheless, if "state law entitles an inmate to release on parole . . . that entitlement is a liberty interest which is not to be taken away without due process." *Inmates of Orient*, 929 F.2d at 235. Determining whether state law creates such an interest requires examination of the state's "statutory scheme as a whole." *Thomas*, 140 F.4th at 342 n.1.

Hester acknowledges that an inmate can claim a constitutional right to the grant of parole only if state law creates a specific entitlement to it. And he rightly recognizes that the Tennessee parole scheme creates no such entitlement. Yet he argues antithetically that once the Tennessee Board of Parole grants parole, so long as it does not revoke that grant, an inmate has a legitimate claim of entitlement—i.e., a liberty interest in being released on parole. We see no principled way to distinguish Hester's case from others in which courts have rejected inmates' claims to a liberty interest in parole release absent state law creating such an interest.

Because Tennessee's statutory scheme creates no expectancy of release, Hester does not rely on the structure of the statute to establish his liberty interest.**3**  Instead, he argues that his signed COP, which was issued pursuant to Tenn. Comp. R. & Regs. 1100-01-01-.09(1)(a), gave him "'a legitimate claim of entitlement' to parole." (Appellant Br., ECF 9, 33).  Notably, he points to no language in that regulation which might establish such a protected interest.  Rather, Hester directs us to *Morrissey v. Brewer*, 408 U.S. 471 (1972), to argue that when parole is granted—in his case via the COP—an inmate has a "liberty interest in remaining free." (Appellant Br., ECF 9, 27).  But this unremarkable proposition does not help Hester.  *Morrissey* addressed a different scenario and articulated a specific interest not relevant here; it recognized that a parolee already freed from custody has a protectable interest in retaining that freedom. 408 U.S. at 481–82.  Therefore, a person in those circumstances has a right to due process before having their independence taken away again.  *Id.* at 482 ("[T]he liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others.").  This is not difficult to understand; someone who has been living outside the strictures of custody faces an acute impingement on their freedom when revocation occurs.  Hester contends *Morrissey*'s rationale should extend to inmates awaiting parole release.  This would mean that the liberty interest would vest when parole is granted, rather than when a parolee is physically released from custody.  According to Hester, his COP established a liberty interest in his release because his parole was "deemed effective" on a date certain—regardless of his custodial status. (Appellant Br., ECF 9, 29).

We find it difficult to square Hester's argument with *Jago v. Van Curen*, 454 U.S. 14 (1981), and *Inmates of Orient*.  Both cases involved inmates who had been granted parole.  In *Jago*, the plaintiff inmate alleged a due process violation based on the recission of his parole without a hearing. 454 U.S. at 16.  The Supreme Court held that the inmate was not entitled to a hearing before his parole was rescinded because Ohio law created no liberty interest in parole. *Id.* at 21 (applying *Greenholtz*, 422 U.S. 1).  Similarly, in *Inmates of Orient*, inmates who had

---

**3**True, Tennessee law provides that "the prisoner . . . if paroled *shall be* allowed to go upon parole outside of prison walls."  TENN. CODE ANN. § 40-28-117(a)(1) (2024) (emphasis added).  But that portion of the statute stands for the straightforward premise that a grant of parole means that the inmate will be released.  In other words, it merely defines parole.  Regardless, Hester does not rely on this language, and neither party has provided briefing on it.  So we do not consider it.

received favorable parole decisions after having a full hearing argued that their due process rights were violated when their "on or after dates" for release were later rescinded without a hearing. 929 F.2d at 234–35. In ruling on the inmates' appeal of the district court's denial of a preliminary injunction to bar the recissions, we concluded that the inmates had "no constitutionally protected liberty interest in being released at a time related to [their] on or after date[s]" under Ohio law. *Id.* at 235. This conclusion was based on our reasoning that since Ohio law establishes "no legitimate claim of 'entitlement' to parole before the expiration of a valid sentence of imprisonment," the recission of an "on or after date" for parole release is not a protected liberty interest. *Id.* at 235–36. We relied on the rationale contained in *Greenholtz* and *Jago* that where granting parole is "purely discretionary" under state law, an inmate enjoys no liberty interest in release "before the expiration of a valid sentence of imprisonment." *Id.* (citation omitted).

Hester attempts to distinguish *Jago* and *Inmates of Orient* from his circumstances because his parole was not revoked, and the inmates' parole release in each of those cases depended on a contingency. For example, in *Jago*, because Ohio law allowed for the recission of parole, says Hester, the inmate's release was contingent on the board not rescinding parole. And in *Inmates of Orient*, Hester suggests that the parole order was "under review by the circuit court as part of contemplated parole procedures." (Appellant Br., ECF 9, 35). True, the parole authority did not revoke Hester's parole; rather, his release was delayed due to an invalid detainer warrant. But this is a distinction without difference for purposes of evaluating the existence of a liberty interest. Under Tenn. Comp. R. & Regs. 1100-01-01-.09(1)(d), Hester's release date—like those in *Jago* and *Inmates of Orient*—also was contingent. The Board could, among other things, "delay a parole date" if it received significant new information. *See* TENN. COMP. R. & REGS. 1100-01-01-.09 (2022). And, at bottom, those decisions denied the existence of a liberty interest simply because Ohio law does not create a liberty interest in parole. *Jago*, 454 U.S. at 21; *Inmates of Orient*, 929 F.2d at 235–36. The same is true here. So the fact that Hester challenges the actions of county actors rather than the Parole Board is neither here nor there. Tennessee's statutory framework does not establish a liberty interest in parole release, so Hester enjoyed no particular due process right under these circumstances.

Resisting this conclusion, Hester turns our attention to *Vitek v. Jones*, 445 U.S. 480 (1980), and *Wolff v. McDonnell*, 418 U.S. 539 (1974)—to no avail.  Both cases are consistent with the teachings of *Greenholtz* and its progeny that a liberty interest exists where a state creates a legitimate claim of entitlement.  In *Vitek*, the Supreme Court determined that a state statute created for inmates a protectable interest in not being involuntarily transferred to mental health facilities without a prior finding that they were suffering from mental illness.  445 U.S. at 490–91.  And in *Wolff*, the Court held that a statutory framework establishing procedures for granting and taking away inmates' "good-time credits"—which could affect parole eligibility—created a liberty interest in the credits subject to due process requirements.  418 U.S. at 557–58.  Neither case helps Hester overcome the fact that Tennessee law does not create a protected liberty interest in parole.  Nor do they support his theory that the COP establishes such an interest.

Hester also relies on out-of-circuit and state court cases to argue that he had a legitimate entitlement to release pursuant to his COP.  *See Kelch v. Dir., Nev. Dep't of Prisons*, 10 F.3d 684 (9th Cir. 1993); *Patuxent Inst. Bd. of Rev. v. Hancock*, 620 A.2d 917 (Md. 1993); *Monohan v. Burdman*, 530 P.2d 334 (Wash. 1975) (en banc).  However, not only are these cases non-binding, they also are unpersuasive for the proposition that Hester advances.  *See, e.g.*, *Phillips v. United States*, 734 F.3d 573, 583 (6th Cir. 2013) ("We, of course, are not bound by a decision from another circuit." (citation omitted)).

In sum, Hester has not adequately explained why a delay in release, before the expiration of his sentence, would garner procedural safeguards that revocation of parole or rescission of a release date does not.  Thus, we agree with the district court that he has not shown a plausible liberty interest in his release from parole.

### b.  *Over-Detention/Clearly Established Law*

Even if Hester somehow had a liberty interest, he points to no caselaw that would have placed county officials on notice that their actions in causing a delay in release after the issuance of a COP would violate that interest.  Indeed, Hester acknowledges that he "has not found a case directly on point" clearly establishing a statutorily created liberty interest based on the issuance of his COP.  (Appellant Br., ECF 9, 23).  He instead argues that over-detention cases are more

analogous to his situation than parole cases are.  And he urges us to recognize his liberty interest based on over-detention caselaw as well.  Specifically, he says that just as an inmate has a constitutionally protected liberty interest in being released at the end of his term of imprisonment, an inmate, likewise, has a liberty interest in not being over-detained past his parole-release date.  But over-detention cases offer him no more relief than parole cases do.

When an inmate's sentence expires, the state loses its power to hold him, and continued detention can violate his right to due process under the Fourteenth Amendment.  *See McNeil v. Dir., Patuxent Inst.*, 407 U.S. 245, 246 (1972).  Hester points us to *Shorts v. Bartholomew* for the principle that "an incarcerated inmate has a liberty interest in being released at the end of his term of imprisonment."  255 F. App'x 46, 51 (6th Cir. 2007) (citation modified).  But *Shorts* is both nonbinding and inapt.  In *Shorts*, the respondent inmate had received a split sentence that included one year of incarceration to be followed by seven years of probation, with a predetermined probation-release date.  *Id.* at 47–48.  Yet the county and its officials kept Shorts in prison over 200 days beyond his one-year prison term.  *Id.* at 48–49.  Finding that the county sheriff, in his official capacity, had over-detained Shorts and violated his constitutional rights, we reversed the grant of summary judgment to the county.  *Id.* at 60.  *Cf. Jones v. Bottom*, 85 F.4th 805, 810–11 (6th Cir. 2023) (calling into question *Shorts*'s conclusion of a well-established right under the Eighth and Fourteenth Amendments).  Hester argues that county authorities over-detained him, like Shorts, when he should have been conditionally released.

Parole, however, confers different rights and expectations than does probation because it is "more akin to imprisonment."  *Samson v. California*, 547 U.S. 843, 850 (2006).  Indeed, "parole is an established variation on imprisonment of convicted criminals."  *Morrissey*, 408 U.S. at 477.  The Supreme Court has observed that "[t]he essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence."  *Id.*  Probation, conversely, is "in lieu of[] incarceration."  *Samson*, 547 U.S. at 850 (citation omitted).  Thus, Shorts, as a probationer serving the second phase of his split sentence, had completed his full prison term.  In contrast, Hester has not completed his prison term; his term does not expire until 2033.  So the similarities between the circumstances are somewhat superficial.  Moreover, even if *Shorts* were sufficiently

analogous to Hester's case, as an unpublished case, it could not place officials on notice that their actions violated a constitutional right. *Bell v. City of Southfield*, 37 F.4th 362, 367–68 (6th Cir. 2022).

Hester also points us to out-of-circuit over-detention cases, arguing that once a detainee is ordered released, there is little tolerance for administrative delay. *See Davis v. Hall*, 375 F.3d 703, 713 (8th Cir. 2004) (discussing *Young v. City of Little Rock*, 249 F.3d 730, 732–33 (8th Cir. 2001)); *Berry v. Baca*, 379 F.3d 764, 771–72 (9th Cir. 2004); *Brass v. County of Los Angeles*, 328 F.3d 1192, 1202 (9th Cir. 2003). But in each case, the detainees who were over-detained had reached the end of any valid period of detention or term of imprisonment. And unlike Hester, they had no additional form of community supervision. *Young*, 249 F.3d at 732–33; *Berry*, 379 F.3d at 766–67; *Brass*, 328 F.3d at 1194. What's more, out-of-circuit cases can only clearly establish the law when they "'both point *unmistakably* to' a holding and are '*so clearly* foreshadowed by applicable direct authority as to leave *no doubt*' regarding that holding." *Ashford v. Raby*, 951 F.3d 798, 804 (6th Cir. 2020) (quoting *Ohio Civ. Serv. Emps. Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir. 1988)). That is not the case here, where none of these cases address the rights of inmates like Hester who have been granted parole but have not reached the end of their term of imprisonment.

Because Hester has failed to show that he had a protected liberty interest that was clearly established at the time of his delayed release, his claim fails, and we need not consider the two remaining elements of a procedural due process claim. *See EJS Props.*, 698 F.3d at 855.

### 2. *Monell* Claim against Chester County

On appeal, Hester contends that Chester County is liable under two *Monell* theories: a single decision by a policymaker (by Weaver) and a policymaker's ratification of illegal action (Weaver ratifying Griffin and Stout's filing of the detainer). As an initial matter, however, a "county cannot be liable under § 1983 absent an underlying constitutional violation by its officers." *See Roell v. Hamilton County*, 870 F.3d 471, 487 (6th Cir. 2017) (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004)). Because Hester fails to establish a

constitutional violation, his *Monell* claim against Chester County fails as well. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

### 3. State-law Claims

Hester maintains that the district court abused its discretion when it declined to exercise supplemental jurisdiction over his state-law claims after dismissing his federal claims. He argues that his state-law claims are closely tied to his federal claims and that separate adjudication would waste judicial resources and risk inconsistent results.

A district court may decline to exercise supplemental jurisdiction after dismissing all claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c)(3); *Osborn v. Haley*, 549 U.S. 225, 245 (2007). We review a lower court's decision to decline supplemental jurisdiction for abuse of discretion. *See Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010). When deciding whether to exercise supplemental jurisdiction, courts consider and weigh the "values of judicial economy, convenience, fairness, and comity." *Id.* at 951–52 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). When a district court has dismissed all federal claims, the balance of considerations usually points to dismissing any remaining state-law claims. *Id.* The district court here dismissed the state-law claims because it had dismissed all federal claims, and Hester's case was neither old nor voluminous, nor had the district court involved itself extensively in the case already. The district court did not abuse its discretion when it balanced the relevant factors and declined to exercise supplemental jurisdiction.

**IV.**

We AFFIRM.